## HOBART ESTATE CO. v. DOUGLASS.
### No. 8483.

Circuit Court of Appeals, Ninth Circuit.

Feb. 23, 1938.

Warren Olney, Jr., J. M. Mannon, Jr., and Morris M. Doyle, all of San Francisco, Cal. (McCutchen, Olney, Mannon & Greene, of San Francisco, Cal., of counsel), for appellant.

George Springmeyer, Sallie R. Springmeyer, and Bruce R. Thompson, all of Reno, Nev. (Springmeyer & Thompson, of Reno, Nev., of counsel), for appellee.

Before GARRECHT, MATHEWS, and HANEY, Circuit Judges.

MATHEWS, Circuit Judge.

Appellee, W. G. Douglass, a citizen of Nevada, as administrator de bonis non with the will annexed of the estate of J. B. Overton, deceased, sued appellant, Hobart Estate Company, a California corporation, to quiet appellee's title to a tract of land in Washoe county, Nevada. The suit was commenced in a state court of Nevada, but was, on appellant's petition, removed to the District Court of the United States. Appellant filed an answer and counterclaim, asserting that the land in controversy was held in trust by appellee for appellant, and praying that appellee be required to convey the land to appellant, and that title thereto be quieted in appellant. From a decree quieting title in appellee, this appeal is prosecuted.

The land in question is the southeast quarter of section 16, township 16 north, range 18 east. Section 16 is broken by the meander line of the northeast shore of Lake Tahoe and is, consequently a fractional section. It contains, in all, 580.65 acres, of which 320 are in the north half, 100.97 in the southwest quarter, and 159.68 in the southeast quarter.

From 1878 to 1917 appellant's predecessor in title, Sierra Nevada Wood & Lumber Company, a California corporation (hereafter called Sierra Nevada), was engaged in business in Nevada, with its office at Virginia City. From 1882 to 1900 appellee's testator, J. B. Overton, a resident of Virginia City, was Sierra Nevada's superintendent and, as such, had the management and control of its business in Nevada. On and prior to April 3, 1885, Sierra Nevada owned in that state about 20,000 acres of land, including the north half and the southwest quarter of the above mentioned section 16. The southeast quarter of section 16 was then owned by Alice B. M. Goodwin, wife of C. C. Goodwin, of Salt Lake City, Utah.

On April 3, 1885, in Salt Lake City, Utah, Alice B. M. Goodwin and her husband executed a deed conveying the southeast quarter of section 16 to J. B. Overton for a consideration of $200. There is no direct evidence as to when or where the deed was delivered to Overton, but, as will

presently appear, the purchase price of the land was paid at Virginia City, Nevada, on April 15, 1885. From this, and from the fact that Overton lived at Virginia City and, so far as the evidence shows, was never in Salt Lake City, it is, we think, a reasonable inference that the deed was delivered and the purchase completed at Virginia City on April 15, 1885. The deed was, at Overton's request, recorded in the records of Washoe county, Nevada, on April 21, 1885.

On April 15, 1885, between the date of execution and the date of recordation of the above-mentioned deed, Overton issued, or caused to be issued, Sierra Nevada's check No. 2641, drawn on a San Francisco bank, payable to D. L. Bliss or order, for $200. The check was made out by Sierra Nevada's bookkeeper, John R. White, and was signed on behalf of Sierra Nevada by Overton, as superintendent. The check bears the indorsement of D. L. Bliss and of the bank on which it was drawn. On the stub from which the check was detached, in addition to the date, the payee's name and the amount of the check, there was, in the bookkeeper's handwriting, the following notation: "For purchase of S.E. ¼, Sec. 16, T. 16 N., R. 18 E. by deed from C. C. and Alice B. M. Goodwin." The bookkeeper testified that "that check stub was made out at the same time the check was made out, and the stub filled in at the same time to explain what the check was for."

Among Sierra Nevada's records, kept in the usual and ordinary course of business, under Overton's supervision and direction, was a voucher reading as follows: "Virginia, Nev. April 15, 1885, Sierra Nevada Wood and Lumber Co. To D. L. Bliss, Dr. To purchase of S.E.¼ of Section 16 Township 16 Range 18 East/ 200/ Deed on file in Virginia Office from C. C. and Alice B. M. Goodwin. Paid by check #2641, April 15, '85 J. B. Overton Supt." This voucher bore the following indorsement: "Voucher No. 10 D. L. Bliss Date, April 15th, 1885, Amount $200 Paid April 16, 1885, Land a/c."

Who D. L. Bliss was, or why the check was made payable to him, instead of the Goodwins, the record does not show. It is, we think, a reasonable inference that he was an agent or broker through whom the purchase from the Goodwins was effected.

The check item of $200 was carried in Sierra Nevada's journal and ledger, kept, as its other records were, in the usual and ordinary course of business, under Overton's supervision and direction. One such record was a "Statement for the month of April, 1885," in which, under the heading "Disbursements" and the subheading "Land a/c," appeared the entry: "Purchase of land 200."

From 1886 to 1917, inclusive, all of section 16, including the land in controversy, was assessed to, and all taxes thereon were paid by, Sierra Nevada. There is no direct evidence as to how the land in controversy came to be assessed to Sierra Nevada, but, since Overton was Sierra Nevada's superintendent and had charge of its business, we think it a reasonable inference that he, Overton, caused such assessment to be made. In 1886, 1887, 1893, 1894, and 1895, Sierra Nevada's taxes, including those on section 16, were paid by check. These checks were signed on behalf of Sierra Nevada by Overton, as superintendent. Whether, in other years (1888-1892, 1896-1917), taxes on section 16 were paid in cash or by check, the evidence does not show, but it does show that they were paid by Sierra Nevada.

On November 16, 1917, Sierra Nevada was dissolved and trustees were appointed to collect its assets and convey its property to its stockholders. Thereafter, by deeds dated January 30, 1919, and February 3, 1919, the trustees and all the stockholders of Sierra Nevada conveyed all its property, including specifically all of section 16, to appellant. In 1918 and continuously thereafter to and including the year 1930, when this suit was brought, all of section 16 was assessed to, and all taxes thereon were paid by, appellant.

Thus, in each of the 45 years from 1886 to 1930, inclusive, all of section 16 was assessed to, and all taxes thereon were paid by, appellant or its predecessor in title. It was in each of those years described on the assessment roll as, "All of Fractional Sec. 16." Following this description, there was a notation which purported to show the number of acres in section 16. In 1886, 1929, and 1930 the assessment roll showed the correct number of acres, namely, 580.-65. In the years 1887 to 1928, inclusive, the number of acres was incorrectly shown as being 460.97. Whether the assessor or the taxpayer was responsible for this error, the record does not show. However caused, the error is without significance. These were not assessments of a specified number of acres in section 16, but were assessments of

the entire section, including, of course, the land in controversy.

This land was never assessed to, nor was any tax thereon ever paid by, Overton or his estate. Overton never took possession of the land and, so far as the evidence shows, never exercised any dominion or control over it, except such as he exercised for and on behalf of Sierra Nevada. Overton's employment as Sierra Nevada's superintendent terminated at the end of the year 1900. He died on September 27, 1909, leaving a will which named J. H. Clemons as his executor. Letters testamentary were issued to Clemons on October 26, 1909, and, on the same day, an inventory of Overton's estate was filed in the probate court. The estate, according to this inventory, consisted of cash in the sum of $50 and personal property appraised at $50, a total of $100. There was no mention of any land. Thereafter, in due course, on a date prior to April 30, 1910, the probate court made its order distributing said estate.

Twenty years later, on January 23, 1930, appellee obtained letters of administration de bonis non with the will annexed and, on February 10, 1930, commenced this suit to quiet title.[1] On November 16, 1936, a decree was entered in his favor.

The decree must be reversed. The evidence shows conclusively that the land in controversy was purchased and paid for by Overton with Sierra Nevada's money, which he, as Sierra Nevada's superintendent, had in his hands or under his control. There was no manifestation of any intention by Sierra Nevada to make a loan or gift to Overton. Hence, with respect to this land, a trust resulted, of which Overton was trustee and Sierra Nevada was beneficiary. 26 R.C.L. 1227–1229, §§ 72–74; 65 C.J. 431–434, §§ 192, 193; Pomeroy, Equity Jurisprudence, 4th Ed., § 422; Restatement of the Law of Trusts, § 440. Thereafter, until Overton's death, the legal title was held by him in trust for Sierra Nevada. It is now held by appellee in trust for appellant.

The fact, much stressed by appellee, that the deed to Overton was executed 12 days before the land was paid for, is quite immaterial. The deed does not appear to have been delivered until the purchase money was paid. Moreover, it has to be re-membered that Overton and Sierra Nevada were not strangers; that their relations were not merely those of purchaser and payor, but were those of agent and principal; that the money with which Overton purchased and paid for the land in controversy was Sierra Nevada's money; and that he had this money in his hands or under his control when he purchased the land. That being so, it makes no difference whether he paid for the land before or after he got the deed. Compare Boston & Northern Street Ry. Co. v. Goodell, 233 Mass. 428, 124 N.E. 260.

The decree is reversed and the case is remanded, with directions to enter a decree requiring appellee to convey the land in controversy to appellant, and quieting appellant's title thereto.

Reversed and remanded.

---

[1] Section 9765, Nevada Compiled Laws 1929, provides: "Actions for the recovery of any property, real or personal, or for the possession thereof, or to quiet title thereto, or to determine any adverse claim thereon * * * may be maintained by and against executors and administrators in all cases in which the same might have been maintained by or against their respective testators or intestates."